IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **BRENDA L. MORGAN,** | ) | **PUBLISH** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL NO. 05-0499-WS-B** |
| | ) | |
| **NORTH MISSISSIPPI MEDICAL** | ) | |
| **CENTER, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter is before the Court on defendant North Mississippi Medical Center, Inc.'s Motion to Dismiss (doc. 5). The Motion has been briefed and is now ripe for disposition.

**I.    Background.**

On August 26, 2005, plaintiff Brenda L. Morgan ("Morgan") filed the instant Complaint (doc. 1) in this District Court against defendant North Mississippi Medical Center, Inc. ("NMMC"), alleging a state-law claim for outrage, as well as a cause of action for violation of the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA"). The well-pleaded allegations of the Complaint assert that on August 22, 2003, decedent Thomas Henry Morgan, Sr. ("Mr. Morgan") sustained serious injuries (including fractured ribs and vertebrae, a dislocated shoulder, and a pulmonary contusion) in a fall from a tree stand at a hunting camp near Calhoun City, Mississippi. (Complaint, ¶ 4.) Mr. Morgan, who did not have medical insurance, was rushed to NMMC's hospital in Tupelo, Mississippi (the "Hospital"), where he received emergency trauma care and was admitted as a patient. (*Id.*, ¶ 5.) Immediately following Morgan's arrival at the Hospital, Hospital personnel notified her that she would need to make financial arrangements right away for her husband's treatment. (*Id.*) After several stalled attempts commencing within a day after his admission, the Hospital discharged Mr. Morgan on August 31, 2003 (nine days after he was admitted), without conducting an MRI scan of his badly injured back, and despite his serious ongoing medical difficulties. (*Id.*, ¶¶ 6-10.)

An ambulance owned and/or controlled by the Hospital transported Mr. Morgan to his home in Foley, Alabama, where ambulance attendants physically carried him inside the house to his bed on a stretcher.  (*Id.*, ¶¶ 10-11.)  Approximately 12 hours later, Mr. Morgan died from untreated injuries relating to his fall on August 22.  (*Id.*, ¶ 12.)[1]

In its Motion to Dismiss, NMMC contends that dismissal of the Complaint is warranted on three distinct grounds.  First, defendant maintains that this District Court lacks personal jurisdiction over it because NMMC does not possess the requisite minimum contacts with the State of Alabama to reasonably anticipate being haled into court here.  Second, defendant argues that venue does not properly lie in this District Court.  Third, defendant states that the EMTALA claim is not actionable, as a matter of law, and that in the absence of a viable EMTALA cause of action there is no federal subject matter jurisdiction.  Plaintiff contests each of these objections.

## II.    Analysis.

### A.    *Personal Jurisdiction.*

NMMC first contends that Morgan's claims must be dismissed pursuant to Rule 12(b)(2), Fed.R.Civ.P., because personal jurisdiction is nonexistent.  In particular, defendant argues that it is a non-profit Delaware corporation with its principal place of business in Tupelo, Mississippi, and that it lacks the requisite minimum contacts with the State of Alabama to support exercise of personal jurisdiction over it here in a manner consistent with constitutional and statutory guarantees.

#### 1.    *Legal Standard.*

Where a district court in its discretion decides a personal jurisdiction issue without an evidentiary hearing, it is the plaintiff's burden to establish a *prima facie* case of personal jurisdiction over a nonresident defendant.  *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002); *S.E.C. v. Carrillo*, 115 F.3d 1540, 1542 (11th Cir. 1997).  Such a showing requires the presentation of evidence sufficient to withstand a motion for directed

---

[1]    This recitation of background facts is not intended to be, nor should it be construed as, a formal or binding set of factual findings.  This matter is before the Court on a Rule 12(b) motion, and plaintiff's accounts of these events are nothing more than bare allegations at this time.  This Order accepts as true the well-pleaded allegations of the Complaint, but expressly refrains from making any specific findings of fact at this juncture.

verdict. *Id.*  In considering the adequacy of a plaintiff's proffer, district courts accept as true all facts alleged in the complaint, to the extent they are uncontroverted by a defendant's affidavits. *Id.*  If the complaint and the defendant's affidavits conflict, then all reasonable inferences must be construed in the plaintiff's favor. *Id.*  A dispositive motion alleging lack of personal jurisdiction must be denied if the allegations of the complaint state a *prima facie* case of jurisdiction. *Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1356 (11th Cir. 2000).

"When a defendant challenges personal jurisdiction, the plaintiff has the twin burdens of establishing that personal jurisdiction over the defendant comports with (1) the forum state's long-arm provision and (2) the requirements of the due-process clause of the Fourteenth Amendment to the United States Constitution." *Lasalle Bank N.A. v. Mobile Hotel Properties, LLC*, 274 F. Supp.2d 1293, 1296 (S.D. Ala. 2003) (citations omitted); *see also Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*, 421 F.3d 1162, 1166 (11th Cir. 2005) (similar). In Alabama, however, this two-pronged inquiry collapses into a single question because Alabama's long-arm provision permits its courts to exercise personal jurisdiction to the full extent permitted by the Due Process Clause of the Fourteenth Amendment. *See Molina*, 207 F.3d at 1356; *Lasalle Bank*, 274 F. Supp.2d at 1296; *Reliance Nat'l Indemnity Co. v. Pinnacle Cas. Assur. Corp.*, 160 F. Supp.2d 1327, 1332 (M.D. Ala. 2001).  Accordingly, the critical question here is whether the exercise of personal jurisdiction over NMMC conforms with constitutional safeguards.

Due process authorizes the exercise of personal jurisdiction when "(1) the nonresident defendant has purposefully established minimum contacts with the forum;" and "(2) the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice." *Carrillo*, 115 F.3d at 1542 (quoting *Francosteel Corp., Unimetal-Normandy v. M/V Charm, Tiki, Mortensen & Lange*, 19 F.3d 624, 627 (11th Cir. 1994)); *see also Horizon*, 421 F.3d at 1166; *Molina*, 207 F.3d at 1356; *Lasalle Bank*, 274 F. Supp.2d at 1296-97.

The minimum contacts analysis varies depending on whether the type of jurisdiction asserted is general or specific.  Indeed, facts supporting "[p]ersonal jurisdiction may be general, which arise from the party's contacts with the forum state that are unrelated to the claim, or specific, which arise from the party's contacts with the forum state that are related to the claim."

*Nippon Credit Bank, Ltd. v. Matthews*, 291 F.3d 738, 747 (11th Cir. 2002).  Under general jurisdiction, there must be a showing of "continuous and systematic" contacts between the defendant and the forum state even if those contacts are unrelated to the plaintiff's claims.  *Id.* By contrast, specific jurisdiction is proper where (i) the defendant's contacts with the forum state are related or give rise to the plaintiff's cause of action, (ii) the contacts involve some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum, and (iii) the defendant's contacts with the forum are such that the defendant should reasonably anticipate being haled into court there.  *See, e.g., McGow v. McCurry*, 412 F.3d 1207, 1214 (11th Cir. 2005); *Carrillo*, 115 F.3d at 1542; *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1546 (11th Cir. 1993); *Lasalle Bank*, 274 F. Supp.2d at 1297.

        2.     *Application of Jurisdictional Analysis to NMMC.*

Plaintiff argues that, notwithstanding NMMC's lack of a business presence in Alabama, this Court may properly exercise specific jurisdiction over it.[2]  To that end, the Complaint may be fairly read as alleging that when NMMC discharged Mr. Morgan, it placed him in an NMMC ambulance operated by NMMC personnel.  (Complaint, ¶ 10.)  That NMMC ambulance is alleged to have driven Mr. Morgan from the Hospital in Tupelo, Mississippi to his home in Foley, Alabama, at which time NMMC ambulance attendants removed Mr. Morgan from the ambulance, carried him into his home by stretcher, and deposited him in his bed where he died just hours later.  (*Id.*, ¶ 11.)  Plaintiff's opposition brief contends that these allegations adequately establish the elements of specific jurisdiction over NMMC.

Curiously, defendant's reply brief utterly ignores the ambulance allegations and makes

---

     [2]     The parties also spar as to whether NMMC-Hamilton, a 57-bed acute care hospital with nursing home, home health and wellness center services located in Hamilton, Alabama, is sufficient to establish general jurisdiction over this defendant.  NMMC asserts that the Hamilton facility is a separate and distinct corporation from NMMC, although both share the same parent corporation.  The Court's resolution of the specific jurisdiction question renders it unnecessary to explore the legal relationship between these two entities, much less the ramifications of NMMC-Hamilton's existence on the jurisdictional status of NMMC in this litigation, in order to resolve this aspect of the Motion to Dismiss.

no attempt to rebut plaintiff's invocation of specific jurisdiction principles.[3]  Defendant adopts

this strategy at its peril, inasmuch as this Court will not formulate a party's arguments for it.  *See*

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden

upon the district court to distill every potential argument that could be made based upon the

materials before it."); *Pinto v. Universidad De Puerto Rico*, 895 F.2d 18, 19 (1st Cir. 1990) ("The

court is under no duty to exercise imagination and conjure what a plaintiff might have alleged,

but did not, and do counsel's work for him or her.").[4]

Applying the three specific jurisdiction criteria to the facts asserted in the Complaint, it is

clear that plaintiff has sufficiently pleaded a basis for the exercise of personal jurisdiction over

NMMC in Alabama.  First, NMMC's alleged contacts with the forum state (namely, its acts of

transporting Mr. Morgan to his home in Foley, Alabama, physically carrying him inside the

house on a stretcher, and leaving him there) are unquestionably related to plaintiff's causes of

action herein.  Ultimately, this case is factually centered on the propriety of the Hospital's

discharge decision and the ramifications of that decision for Mr. Morgan.  The Hospital's actions

in transferring the decedent from the Hospital to Alabama are inextricably intertwined with,

substantially related to, and ultimately form the factual predicate for plaintiff's theories of

recovery.  Second, when NMMC personnel traveled into Alabama in an NMMC vehicle on

NMMC official business, they were certainly  purposefully availing themselves of the privilege

---

[3]      In lieu of doing so, NMMC's reply brief simply offers an affidavit stating that
NMMC does business solely in Tupelo, Mississippi, and that it is not qualified, authorized or
licensed to do business in Alabama.  (Reply Brief, at Exh. A.)  At most, such allegations create a
factual dispute with Morgan's assertion in the Complaint that a NMMC ambulance operated by
NMMC staff transported the decedent to his home in Alabama and left him there in an
unstabilized condition.  As indicated *supra*, however, all reasonable inferences must be
construed in the plaintiff's favor and the Motion to Dismiss must be denied if the Complaint
establishes a *prima facie* case of jurisdiction.  Accordingly, NMMC's blanket denial that it
engages in activities outside of Mississippi cannot overcome plaintiff's specific allegations of
NMMC conduct in Alabama for purposes of the Rule 12(b)(2) Motion.

[4]      Moreover, defendant does not proffer evidence that it did not own or control the
ambulance, that it did not employ or control the ambulance attendants, or that the ambulance and
its crew were not performing official Hospital business by transporting Mr. Morgan to Alabama.
As such, this analysis assumes that Mr. Morgan traveled in an NMMC ambulance driven by
NMMC personnel on NMMC business.

of conducting activities in Alabama.  Had defendant's ambulance been struck by another motorist in Foley, Alabama, defendant would have had access to the protections of Alabama law in connection with that incident.  It would defy common sense to suggest that NMMC did not intend to avail itself of the protections and benefits of Alabama law when it dispatched its agents and equipment into this State to transfer Mr. Morgan to his home.  Third, NMMC should absolutely have reasonably anticipated being haled into court in Alabama in the event of any problems in connection with its ambulance foray in this State.  For instance, had defendant's ambulance wrongfully struck another motorist while traversing the streets of Foley, Alabama, it would be foolhardy for defendant not to expect to be sued in Alabama for that transgression.

Simply put, the allegations of the Complaint reasonably support the inference that defendant intentionally directed Hospital personnel to travel into Alabama in a Hospital vehicle with a Hospital patient who had just been discharged.  The only sensible construction of these facts is that defendant purposefully aimed its official activities into the State of Alabama.  In so doing, it must have known that any difficulty that its agents encountered in Alabama might be remediable in courts in the State of Alabama pursuant to Alabama law.  Plaintiff's claims against NMMC arise directly from its acts of ejecting Mr. Morgan from the Hospital, carrying him to Alabama, and abandoning him there.  Nothing more is required to establish specific jurisdiction.[5]

Having ascertained that NMMC possesses the requisite minimum contacts with Alabama, the undersigned now turns to the second element of the due process inquiry, to-wit: whether asserting personal jurisdiction over NMMC would comport with traditional notions of fair play and substantial justice.  *Carrillo*, 115 F.3d at 1542.[6]  There appears to be nothing intrinsically

---

[5]    Even if the facts alleged in the Complaint were inadequate as to one or more of the three prongs of the specific jurisdiction test, the Court finds that defendant has waived any such arguments by virtue of its failure to offer any substantive response to plaintiff's contention that defendant's in-state ambulance travel satisfies the prerequisites for specific jurisdiction. This Court will not speculate as to how NMMC might have combated the specific jurisdiction theory had it endeavored to do so.

[6]    The "fair play and substantial justice" analysis hinges on such factors as "the burden on the defendant in defending the lawsuit, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies and the shared

unfair or unjust about requiring a Mississippi hospital that engages in patient transport activities in Alabama to defend a lawsuit in this state relating to and arising from such activities.   Stated differently, NMMC has minimum contacts with this forum, and is unable to meet its concomitant burden "to show that the imposition of jurisdiction in the forum is unreasonable." *Ruiz de Molina*, 207 F.3d at 1358.  Indeed, defendant offers no evidence that it will incur any meaningful burden in defending this action in a neighboring state, much less that any such burden outweighs the interests of Morgan and Alabama in having this dispute resolved here.  Even if defendant had demonstrated hardship, which it has not, the fact remains that "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum will justify even the serious burdens placed on the alien defendant." *Vermeulen*, 985 F.2d at 1551 (citations omitted).

For all of the foregoing reasons, the Court finds that the exercise of personal jurisdiction over NMMC in this forum may be achieved without infringing on its due process rights or implicating the Alabama long-arm statute.  On that basis, the Motion to Dismiss is **denied** insofar as it rests on a Rule 12(b)(2) personal jurisdiction argument.

**B.**      ***Venue.***

As a secondary position, NMMC maintains that this action should be dismissed for improper venue, pursuant to Rule 12(b)(3), Fed.R.Civ.P.  Defendant's Motion invokes 28 U.S.C. § 1391(b), and will therefore be assessed according to that statute's standards for improper venue, rather than the framework set forth in 28 U.S.C. § 1404(a) for inconvenient venue.[7]

Under § 1391(b), venue in a civil case wherein jurisdiction is not based solely on diversity is proper in any of the following locations:

"(1) a judicial district where any defendant resides, if all defendants reside in the

---

interest of the states in furthering fundamental substantive social policies." *Horn v. Effort Shipping Co., Ltd.*, 777 F. Supp. 927, 931 (S.D. Ala. 1991) (citations omitted).

[7]     In the course of its argument that venue is improper, NMMC protests that this forum "will prove to be unreasonable and inconvenient" and that most "staff, witnesses and records related to the screening and treatment decision that gave rise to this claim will be found in Mississippi."  (Reply Brief, at 9.)  Such arguments might resonate in the *forum non conveniens* context of § 1404(a); however, they are not relevant to the legal issue raised by NMMC, to-wit:  whether venue is properly laid in this District Court pursuant to § 1391(b).

same State, (2) a judicial district in which a substantial part of the events or
omissions giving rise to the claim occurred ..., or (3) a judicial district in which
any defendant may be found, if there is no district in which the action may
otherwise be brought."

*Id.*  Because the face of the Complaint demonstrates that neither (1) nor (3) are satisfied here, the propriety of this District Court as a venue for the instant dispute turns on whether a substantial part of the events giving rise to Morgan's claims took place in this judicial district.

NMMC asserts that no substantial portion of the events occurred in Alabama.  According to NMMC, "[t]he essential elements of the claim examine the initial screening and stabilization treatment," both of which occurred in Mississippi.  (Reply Brief, at 10.)  The transfer of Mr. Morgan to Alabama, NMMC states, "pales in comparison to 8 days of care given in Mississippi."  (*Id.*)  This line of argument – that venue does not lie in Alabama because the most substantial events took place in Mississippi – misapprehends the governing legal standard.

The venue statute "contemplates some cases in which venue will be proper in two or more districts."  *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003); *see also Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004) ("Under the amended statute, it is possible for venue to be proper in more than one judicial district."); Wright & Miller, *Federal Practice and Procedure* § 3806 (explaining that "it is now absolutely clear that there can be more than one district in which a substantial part of the events giving rise to the claim occurred"); 28 U.S.C. § 1391, Commentary on 1988 and 1990 Revisions ( "there may be several districts that qualify as a situs of such 'substantial' activities" ).  Indeed, under § 1391 a plaintiff does not have to select the venue with the <u>most</u> substantial nexus to the dispute, as long as she chooses a venue where a substantial part of the events giving rise to the claim occurred.  *See Country Home Products, Inc. v. Schiller-Pfeiffer, Inc.*, 350 F. Supp.2d 561, 568 (D. Vt. 2004) (explaining that "the plaintiff is not required to establish that his chosen venue has the most substantial contacts to the dispute; rather, it is sufficient that a substantial part of the events occurred [here], even if a greater part of the events occurred elsewhere"); *Greenblatt v. Gluck*, 265 F. Supp.2d 346, 352 (S.D.N.Y. 2003) (similar); *TruServ Corp. v. Neff*, 6 F. Supp.2d 790, 792 (N.D. Ill. 1998) ("The test is not whether a majority of the activities pertaining to the case were performed in a particular district, but whether a substantial portion of the activities giving rise to the claim occurred in the particular district.").  Thus, the question confronting the undersigned is

-8-

not whether the lion's share of the events at issue occurred in the Southern District of Alabama, nor is it the relative magnitude and significance of the events occurring in this judicial district as compared to those in the Northern District of Mississippi.  Instead, the question is simply whether "a substantial part" of the events transpired here.

In evaluating whether events or omissions support venue under § 1391(b), the Eleventh Circuit has made clear that "[o]nly the events that directly give rise to a claim are relevant" and that "only those acts and omissions that have a close nexus to the wrong" are properly weighed in the "substantial part" analysis.  *Jenkins Brick*, 321 F.3d at 1372; *see also Daniel v. American Bd. of Emergency Medicine*, 428 F.3d 408 (2nd Cir. 2005) ("When material acts or omissions within the forum bear a close nexus to the claims, they are properly deemed significant and, thus, substantial, but when a close nexus is lacking, so too is the substantiality necessary to support venue.").[8]  In that regard, the Court finds a close nexus between the alleged acts and omissions of NMMC in the Southern District of Alabama and the claims asserted by Morgan in this lawsuit.  The gravamen of plaintiff's claims is that the Hospital admitted Mr. Morgan under false pretenses, failed to stabilize his emergency medical condition, then shipped him via Hospital ambulance to his home in this judicial district, where he died a short time later.  The legal elements of the alleged EMTALA violation may have been satisfied the moment that NMMC wheeled Mr. Morgan out the front door of the Hospital and into a waiting ambulance.  Nonetheless, NMMC's alleged act of transporting him to and leaving him in Alabama bear a "close nexus" to the alleged wrong under any reasonable construction of the term, from a logical, temporal and sequential vantage point.  Moreover, plaintiff will undoubtedly rely heavily on the Alabama events to prove that Mr. Morgan was "transferred" for EMTALA purposes without prior stabilization of his emergency medical condition, inasmuch as his rapid decline upon being left in his home might support an inference that the Hospital failed to stabilize him (within the

---

[8]        This philosophy has not been embraced by all appellate courts in interpreting the "substantial part" language.  *See, e.g., Mitrano*, 377 F.3d at 405 (citing First and Sixth Circuit authorities for proposition that "in determining whether events or omissions are sufficiently substantial to support venue under the amended statute, a court should not focus only on those matters that are in dispute or that directly led to the filing of the action," but instead "should review the entire sequence of events underlying the claim").

statutory meaning of the term) before discharging him.  Thus, the Alabama occurrences may figure prominently in the proof at trial.  On that basis, the undersigned is of the opinion that venue properly lies in this judicial district.  Defendant's Motion to Dismiss for improper venue is therefore **denied** pursuant to 28 U.S.C. § 1391(b)(2) and *Jenkins Brick*.[9]

> ### C.    *Viability of EMTALA Cause of Action.*

Defendant's third and final ground for relief is that plaintiff's EMTALA claim fails to state a claim upon which relief can be granted, such that dismissal is warranted pursuant to Rule 12(b)(6), Fed.R.Civ.P.  The Court disagrees, at least in part.

> #### 1.    *Legal Standard for Rule 12(b)(6) Motion.*

On a motion to dismiss, the Court must view the complaint in the light most favorable to the plaintiff.  *Jenkins v. McKeithen*, 395 U.S. 411, 421-22, 23 L. Ed. 2d 404, 89 S. Ct. 1843 (1969).  A motion to dismiss may be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); *Bradberry v. Pinellas County*, 789 F.2d 1513, 1515 (11th Cir. 1986).  The rules of pleading require only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 8(a), Fed.R.Civ.P.  Moreover, the Court must, "at this stage of the litigation, . . . accept [plaintiff's] allegations as true."  *Hishon v. King & Spalding*, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984); *Stephens v. HHS*, 901 F.2d 1571, 1573 (11th Cir. 1990); *cf. South Florida Water Management Dist. v. Montalvo*, 84 F.3d 402, 409 n.10 (11th Cir. 1996) (conclusory allegations and unwarranted deductions of fact are not deemed true on a motion to dismiss).  The Court's inquiry at this stage focuses on whether the challenged pleadings "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 47.  A plaintiff must meet only an "exceedingly low" threshold to withstand

---

[9]    In reaching this determination, the Court notes that defendant failed to offer any legal authority or analysis in support of its conclusory suggestion that NMMC's ambulance transportation of Mr. Morgan into Alabama does not qualify as a "substantial part" of the events. Instead, defendant simply argued that the events in Alabama were less critical or important than those events occurring in Mississippi.  Such a relativist argument is unilluminating and unhelpful in applying the *Jenkins Brick* framework.

a Rule 12(b)(6) motion.  *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 881 (11th Cir. 2003).

        2.      *Overview of EMTALA.*

      EMTALA is a federal anti-dumping provision that was enacted in 1986 for the stated purpose of preventing "patient dumping," which is "the practice of some hospital emergency rooms turning away or transferring indigents to public hospitals without prior assessment or stabilization treatment."  *Harry v. Marchant*, 291 F.3d 767, 772 (11th Cir. 2002) (*en banc*); *see also Hunt ex rel. Hunt v. Lincoln County Memorial Hosp.*, 317 F.3d 891, 893 n.5 (8th Cir. 2003) ("This law was enacted to address patient 'dumping' by hospitals of patients without the appropriate amount of insurance."); *Holcomb v. Monahan*, 30 F.3d 116, 117 n.2 (11th Cir. 1994) ("Congress enacted EMTALA to prevent 'patient dumping' (the practice whereby private hospital emergency rooms refuse to treat indigent patients by transferring them to public hospitals or turning them away).").  Courts have universally recognized that EMTALA was not conceived as a federal medical malpractice statute.  *See, e.g., Nolen v. Boca Raton Community Hosp., Inc.*, 373 F.3d 1151, 1154 (11th Cir. 2004); *Harry*, 291 F.3d at 770; *Hunt*, 317 F.3d at 894; *Jakubiec v. Sacred Heart Health System, Inc.*, 2005 WL 1261443, *2 (N.D. Fla. May 27, 2005); *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.*, 2001 WL 617521, *4 n.4 (M.D. Ala. Feb. 20, 2001); *Gardner v. Elmore Community Hosp.*, 64 F. Supp.2d 1195, 1201 (M.D. Ala. 1999).

      EMTALA requires hospitals to satisfy two distinct obligations, which are commonly labeled as the "appropriate medical screening requirement" and the "stabilization requirement."  *Harry*, 291 F.3d at 770.  Pursuant to the former duty, if an individual comes to a hospital's emergency department and requests examination or treatment of a medical condition, "the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department ... to determine whether or not an emergency medical condition ... exists."  42 U.S.C. § 1395dd(a).  Under the latter, if an individual comes to a hospital and the hospital determines that person to have an emergency medical condition, then the hospital must either provide "such further medical examination and such treatment as may be required to stabilize the medical condition" or "transfer ... the individual to another medical facility" in accordance with EMTALA requirements.  42 U.S.C. § 1395dd(a); *see also Harry*, 291 F.3d at 770 (characterizing stabilization requirement as mandating that hospital provide stabilization treatment before transferring patient with an emergency condition).  Morgan's

-11-

EMTALA claim purports to allege violations of both statutory requirements.[10]

3.      *The Appropriate Medical Screening Requirement.*

Plaintiff maintains that the Hospital failed to comply with the screening requirement of EMTALA "by failing to obtain an MRI scan of Mr. Morgan's back ... to determine that an emergency medical condition existed in the thoracic region of his spine" on August 30, 2003. (Complaint, ¶ 17.)  Neither the Complaint nor plaintiff's submission as to the Motion to Dismiss supplies further amplification of the screening aspect of her EMTALA claim.

Review of pertinent case authorities confirms that EMTALA's medical screening requirement is far too narrow to sustain plaintiff's claim.  Contrary to plaintiff's contention, the screening duty is not triggered whenever a hospital neglects to perform a screening test that the plaintiff believes should have been done, or even one that any reasonably diligent hospital would have performed.  Rather, EMTALA's screening obligation is focused exclusively on ensuring that a hospital applies the same screening procedures for indigent patients who present at its emergency room that it does for similarly situated patients who have insurance or are otherwise

_____

[10]      As a threshold matter, MMNC argues that EMTALA "applies only to persons who present to hospital emergency departments."  (Motion, ¶ 4.)  In support of this contention, defendant relies heavily on *Lopez-Soto v. Hawayek*, 175 F.3d 170 (1st Cir. 1999).  But *Lopez-Soto* actually stands for a proposition dramatically different than that ascribed to it by defendant. In *Lopez-Soto*, the First Circuit declared that, while the screening requirement is limited to emergency departments, the stabilization requirement "unambiguously imposes certain duties on covered hospitals vis-a-vis *any* victim of a detected medical emergency, regardless of how that person enters the institution or where within the walls he may be when the hospital identifies the problem."  *Id.* at 173; *see also* 42 U.S.C. § 1395dd(b) (imposing stabilization requirement whenever individual "comes to a hospital and the hospital determines that the individual has an emergency medical condition," with no textual limitation to emergency departments).  *Lopez-Soto* reasoned that the broad sweep of the stabilization requirement makes sense because "stabilization is arguably the key to ensuring the health of those already admitted to the hospital who develop emergency medical conditions."  175 F.3d at 175.  When the defendant asserted (as does NMMC here) that interpreting the stabilization requirement so expansively would do violence to the legislative purpose of EMTALA to clamp down on patient dumping, *Lopez-Soto* rebuffed this objection by reasoning that "patient dumping is not a practice that is limited to emergency rooms," and that dumping admitted patients who develop emergency conditions "is equally as pernicious as what occurs in emergency departments, and we are unprepared to say that Congress did not seek to curb it."  *Id.* at 177.  Thus, NMMC's attempt to confine all EMTALA obligations to emergency departments results from an incorrect reading of the statute and the caselaw.

well-heeled.  *See, e.g., Holcomb*, 30 F.3d at 117 (explaining that statute's appropriate medical
screening requirement "only requires a hospital to provide indigent patients with a medical
screening similar to one which they would provide any other patient").[11]  Simply put, "[a]s long
as a hospital applies the same screening procedures to indigent patients which it applies to
paying patients, the hospital does not violate" the screening section of EMTALA.  *Holcomb*, 30
F.3d at 117.  Thus, failing to perform even a medically advisable screening test in no way
implicates EMTALA <u>unless</u> the Hospital treated Mr. Morgan differently in that regard than it
would have treated a similarly situated paying patient.  *See Hunt*, 317 F.3d at 894 (affirming
dismissal of EMTALA screening claim where plaintiff's claim was not that he received non-
uniform treatment, but that he received incorrect treatment).[12]

   The Complaint is devoid of any suggestion that the Hospital engaged in disparate
treatment of Mr. Morgan vis a vis insured customers, or that it violated its own screening
protocols in neglecting to give him an MRI; rather, the crux of the "screening" portion of the
claim is simply that Mr. Morgan needed an MRI, but the Hospital failed to provide one for him.

---

[11]    A veritable avalanche of appellate and district court authority in this Circuit
confirms the validity of that interpretation of § 1395dd(a).  *See Nolen*, 373 F.3d at 1155 ("So
long as the Hospital gave to [the plaintiff] the same quality screening that it would have given a
similarly situated outpatient, there is no violation of the EMTALA."); *Jakubiec*, 2005 WL
1261443, at *2 (following *Holcomb* and *Nolen*); *Williamson v. Roth*, 120 F. Supp.2d 1327,
*1333 (M.D. Fla. 2000) ("As long as a hospital applies the same screening procedures to
indigent patients which it applies to paying patients, the hospital does not violate this section of
EMTALA."); *see also Gardner*, 64 F. Supp.2d at 1201 (hospital satisfies EMTALA's screening
requirement if "it utilizes identical screening procedures for all patients complaining of the same
condition or exhibiting the same symptoms").

[12]    As one district court cogently and correctly observed, "[t]he essence of this
requirement is that there be some screening procedure, and that it be administered
even-handedly.  Therefore, a refusal to follow regular screening procedures in a particular
instance contravenes the statute, but faulty screening, in a particular case, as opposed to disparate
screening or refusing to screen at all, does not contravene the statute."  *Gardner*, 64 F. Supp.2d
at 1202; *see also Summers v. Baptist Medical Center Arkadelphia*, 91 F.3d 1132, 1138 (8th Cir.
1996) ("Patients are entitled under EMTALA, not to correct or non-negligent treatment in all
circumstances, but to be treated as other similarly situated patients are treated, within the
hospital's capabilities. It is up to the hospital itself to determine what its screening procedures
will be. Having done so, it must apply them alike to all patients.").

This aspect of plaintiff's EMTALA claim bears the unmistakable tincture of a malpractice or negligence claim in disguise.  As demonstrated by the foregoing authorities, such a theory, not rooted in any disparate treatment formulation, is not cognizable under EMTALA.

Even if Morgan had properly alleged a theory of disparate treatment sufficient to invoke the appropriate medical screening requirement (which she has not), this obligation is inapplicable here because § 1395dd(a) is confined on its face to Hospital emergency departments.  The statute itself restricts the screening obligation to circumstances where an individual "comes to the emergency department," and requires "an appropriate medical screening examination *within the capability of the hospital's emergency department*."  42 U.S.C. § 1395dd(a) (emphasis added).  This language is bolstered by appellate decisions that have limited the screening requirement to the emergency room setting.  *See Harry*, 291 F.3d at 770 ("The appropriate medical screening requirement obligates hospital emergency rooms to provide an appropriate medical screening ...."); *Lopez-Soto v. Hawayek*, 175 F.3d 170, 173 (1st Cir. 1999) (construing § 1395dd(a) as "obligat[ing] hospitals to screen only those individuals who present themselves at the emergency department").  The Court's research has disclosed no authorities, and plaintiff has cited none, in which EMTALA's screening duty has been extended to an inpatient some eight days post-admission to the hospital.  Inasmuch as such a construction of the statute would contravene its express language and does not appear to be supported by any interpretive case law, this Court declines to engraft EMTALA's screening duty to encompass a hospital's failure to perform certain desired tests more than a week after a patient is admitted for treatment.

In short, plaintiff's contention that the Hospital should have performed an MRI on Mr. Morgan's back on August 30, 2003, some eight days after his admission, may well be actionable through various state law vehicles.  It is not, however, in violation of EMTALA's screening requirements, inasmuch as: (a) plaintiff has not alleged that the Hospital treated Mr. Morgan differently than similarly situated insured patients in that regard; and (b) even if such an allegation had been made, the screening requirement is limited to emergency rooms and does not extend to other, non-emergency departments of a hospital post-admission of a patient.  Therefore, the Court finds that plaintiff's EMTALA claim is actionable, if at all, only on a failure to stabilize theory, not on a failure to perform appropriate medical screening.

4.    *The Stabilization Requirement.*

The Complaint also alleges that NMMC failed to comply with EMTALA's stabilization requirement, asserting that the Hospital "failed to provide the medical treatment necessary to stabilize Mr. Morgan and, further, discharged him in an unstable medical condition." (Complaint, ¶ 18.)  Plaintiff argues that these allegations plead a violation of EMTALA, which requires a hospital, when it becomes aware of an individual's emergency medical condition, to provide "such further medical examination and such treatment as may be required to stabilize the medical condition." 42 U.S.C. § 1395dd(b)(1)(A).[13]  The statute defines the term "stabilize" as requiring such treatment of an emergency medical condition "as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." *Id.* § 1395dd(e)(3)(A); *see also Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.*, 124 F. Supp.2d 1228, 1237 (M.D. Ala. 2000) ("A patient's condition is stabilized if no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual.") (citing *Cherukuri v. Shalala*, 175 F.3d 446, 450 (6th Cir. 1999)).  "Transfer" is also a term of art in EMTALA.  It is not confined to inter-hospital patient swaps, but is instead defined as "the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by ... the hospital." 42 U.S.C. § 1395dd(e)(4).

Construing these statutory provisions in unison reveals that § 1395dd(b) is violated if a hospital discharges a patient with knowledge of his emergency medical condition and without engaging in such medical examination and treatment as may be necessary to assure that no material deterioration of the patient's condition will likely result from such discharge.  The case law is consistent with this construction.  For example, one district court has opined that "a viable Section 1395dd(b) claim requires plaintiffs to plead that: (1) they had an emergency medical condition; (2) the hospital knew of the condition; and (3) the patient was not stabilized before

---

[13]       The statute also provides that, as an alternative to stabilization, a hospital may transfer a patient to another medical facility under certain circumstances (*i.e.*, a patient's informed written request to be transferred, certification by a physician or other qualified medical person that the medical benefits of transfer outweigh patient risks, etc.).  That provision of EMTALA is not at issue here.

being discharged or transferred." *Kizzire v. Baptist Health Systems, Inc.*, 343 F. Supp.2d 1074, 1084 (N.D. Ala. 2004); *see also Williamson v. Roth*, 120 F. Supp.2d 1327, 1334 (M.D. Fla. 2000) ("Section 1395dd(b) of EMTALA requires that after a hospital determines that a patient is experiencing an 'emergency medical condition' it must provide 'whatever treatment, within its capabilities, is needed to stabilize the condition before transferring or discharging the patient.'"). The Eleventh Circuit has emphasized that "the triggering mechanism for stabilization treatment under EMTALA is transfer," which plainly includes discharge. *Harry*, 291 F.3d at 772.

NMMC contends that the nine-day interval between Mr. Morgan's arrival at the Hospital and his discharge places this case outside the temporal parameters of the stabilization requirement. (Motion, ¶ 4.) But nothing in § 1395dd(b) would restrict the scope of the stabilization requirement to a maximum number of minutes, hours or days after a person with an emergency medical condition presents at a hospital. To be sure, some courts in other jurisdictions have soldered judicially-crafted limitations onto this requirement; however, others have declined to do so. The Eleventh Circuit appears never to have entered this fray, but research canvassing appellate decisions on this question identifies three distinct approaches. The Fourth Circuit has imputed a fuzzy, ill-defined temporal limitation on all § 1395dd(b) claims, such that the stabilization requirement is confined to "the hospital's care of the patient only in the immediate aftermath of the act of admitting her for emergency treatment and while it considered whether it would undertake longer-term full treatment or instead transfer the patient." *Bryan v. Rectors and Visitors of University of Virginia*, 95 F.3d 349, 352 (4th Cir. 1996) (holding that EMTALA was not violated where patient had been admitted to hospital for 12 days, during which time she received stabilizing treatment). The *Bryan* approach is unsatisfying because (a) by effectively limiting the stabilization duty to emergency departments, it seemingly disregards statutory language extending the stabilization requirement to entire hospitals but limiting the screening requirement to emergency departments; (b) the undersigned would have no idea how to apply the nebulous "immediate aftermath" concept to a specific set of facts; (c) the "immediate aftermath" constraint was cut from whole cloth by the appellate court, and lacks any underpinnings in the statute or its accompanying regulations; and (d) such a holding suggests that hospitals could receive a "free pass" from EMTALA liability simply by admitting patients whom they had no intention of treating, then unscrupulously dumping them a short time later by

discharging them without providing necessary stabilizing treatment. Thus, far from vindicating the statutory purposes, *Bryan* appears to conflict with them by imbuing admission with talismanic significance as a "cure-all" that guarantees freedom from EMTALA liability, regardless of what chicanery a hospital might engage in post-admission to unload an indigent, unprofitable patient with an emergency health condition.

On the other end of the spectrum, the Sixth Circuit has endorsed a position that EMTALA's stabilization requirements can apply well after the patient is admitted to a hospital. In *Thornton v. Southwest Detroit Hosp.*, 895 F.2d 1131 (6th Cir. 1990), the panel interpreted § 1395dd(b) as meaning that "once a patient is found to suffer from an emergency medical condition in the emergency room, she cannot be discharged until the condition is stabilized, regardless of whether the patient stays in the emergency room." *Id.* at 1134. The *Thornton* court expressed concern that if the law were otherwise, hospitals might circumvent EMTALA by admitting emergency room patients then immediately discharging them. On that basis, the Sixth Circuit refused to draw a black-line distinction between emergency room care and inpatient care for purposes of the stabilization requirement, but instead construed EMTALA as creating a blanket requirement that "[e]mergency care must be given until the patient's emergency medical condition is stabilized," whenever and wherever that might occur. *Id.* at 1135; *see generally Lopez-Soto*, 175 F.3d at 175 (interpreting stabilization requirement as "obligating hospitals to stabilize individuals (wherever in the hospital they may be) when emergency medical conditions are detected," with no clear temporal constraint). This approach also seems vulnerable to abuse, inasmuch as it would allow for an open-ended, uncabined duration of the stabilization requirement with no logical limiting principle. Under this line of reasoning, then, the stabilization duty could be imputed as extending indefinitely after a patient's admission and potentially poaching on regulatory territory patrolled by state malpractice law, an outcome which runs directly counter to the stated purpose of EMTALA. *See Lopez-Soto*, 175 F.3d at 177 n.4 ("If stabilization were mandated by EMTALA without limit of time, it might well encroach upon the province of state malpractice law.").

If the Fourth Circuit's construction of the temporal limits of § 1395dd(b) is too draconian, and if the Sixth Circuit's is too permissive, then, much like Goldilocks in the famed fairy tale, the Ninth Circuit's approach may be just right. In *Bryant v. Adventist Health*

*Systems/West*, 289 F.3d 1162 (9th Cir. 2002), the court weighed both the Fourth and Sixth Circuit alternatives before holding "that EMTALA's stabilization requirement ends when an individual is admitted for inpatient care." *Id.* at 1168.  Lest one conclude that the *Bryant* court merely aped the Fourth Circuit's *Bryan* decision, the Ninth Circuit tempered this holding by recognizing the wisdom of the Sixth Circuit's concern that a hospital might attempt to evade EMTALA liability by admitting a patient under false pretenses to cut off his stabilization rights, then unceremoniously dumping him as soon as the coast was clear.  In that regard, *Bryant* added an important caveat to its inpatient rule, stating that "[i]f a patient demonstrates in a particular case that inpatient admission was a ruse to avoid EMTALA's requirements, then liability under EMTALA may attach," notwithstanding such admission.  *Id.* at 1169; *see also Mazurkiewicz v. Doylestown Hosp.*, 305 F. Supp.2d 437, 447 (E.D. Pa. 2004) ("the most persuasive synthesis of the law on admission as a defense to EMTALA liability is that admission is a defense so long as admission is not a subterfuge").[14]

        The undersigned is of the opinion that the rule announced by the Ninth Circuit in *Bryant* most accurately captures the letter and spirit of EMTALA and its attendant regulations, while also remedying the inherent defects in the Fourth and Sixth Circuit constructions of § 1395dd(b).  In light of these principles, and in the absence of any guidance from the Eleventh Circuit, the Court finds that the EMTALA obligation to stabilize a patient ceases at the time of the patient's admission as an inpatient, <u>unless</u> the hospital fails to admit the patient in good faith or does so as a subterfuge to avert EMTALA liability.

        A fair reading of the Complaint supports a subterfuge theory of liability.  Plaintiff alleges that the Hospital demanded that she make financial arrangements to pay for her husband's

----

        [14]        The *Bryant* holding and its explicit limitation is echoed in the implementing regulations for EMTALA.  Those regulations provide, in pertinent part, that "[i]f a hospital has screened an individual under paragraph (a) of this section and found the individual to have an emergency medical condition, and admits that individual as an inpatient ***in good faith*** in order to stabilize the emergency medical condition, the hospital has satisfied its special responsibilities" under EMTALA.  42 CFR § 489.24(d)(2)(i) (emphasis added).  This regulation confirms that admission of a patient cuts off a hospital's stabilization duty under EMTALA only if that patient has been admitted in good faith.  Defendant quoted this regulation in its reply brief, but curiously omitted the critically important "in good faith" qualifier from the regulatory language.  (*See* Reply Brief, at 2-3.)

-18-

treatment immediately after his arrival at the emergency department, then announced its intention to discharge him the very next day, despite knowledge of the compression fractures of his thoracic vertebrae, his intense back pain, his inability to walk, his pulmonary contusions and the blood in his lungs.  These allegations, accepted as true for Rule 12(b)(6) purposes, could reasonably support a conclusion that the Hospital's admission of Mr. Morgan was a mere façade, a charade undertaken for risk management purposes even though the Hospital had no intention of stabilizing his injuries before transferring him.  Of course, Morgan will be required to prove this subterfuge theory at trial by competent evidence.  For now, however, she has adequately alleged a violation of § 1395dd(b) inasmuch as her Complaint states or fairly implies that: (a) Mr. Morgan presented at the Hospital for treatment of an emergency medical condition; (b) the Hospital had actual knowledge that Mr. Morgan had an emergency medical condition; (c) the Hospital admitted Mr. Morgan as an inpatient, but never intended to provide him stabilizing care; (d) the Hospital discharged Mr. Morgan without providing him such medical treatment of his emergency medical conditions as was necessary to assure, within reasonable medical probability, that no material deterioration of his condition was likely to result from or occur during his transfer from the Hospital; and (e) mere hours after the transfer was completed, Mr. Morgan died in his home from the emergency medical condition in question.  Defendant's Motion to Dismiss is therefore **denied** as to the EMTALA stabilization claim.[15]

This conclusion is not altered by NMMC's attempt to recharacterize plaintiff's EMTALA stabilization cause of action as a concealed negligence or malpractice claim.  (Motion, ¶ 6.)  The Complaint alleges nothing of the sort.  Rather, the EMTALA claim alleges that the Hospital discharged Mr. Morgan without stabilizing a known emergency medical condition.  Such a theory of liability plainly sounds under § 1395dd(b), and presents a colorable claim under that statute notwithstanding defendant's attempts to relabel it as something else.

### III.   Conclusion.

For all of the foregoing reasons, the Motion to Dismiss (doc. 5) is **granted in part, and**

---

[15]     Because the stabilization claim passes Rule 12(b)(6) muster, plaintiff's EMTALA claim confers upon the Court federal question jurisdiction pursuant to 28 U.S.C. § 1331.  The requisite jurisdiction plainly exists, and defendant's argument that this action should be dismissed for want of subject matter jurisdiction is unfounded.

-19-

**denied in part**.  In particular, the Motion is **granted** as to the EMTALA claim predicated on violation of the appropriate medical screening requirement, and that aspect of Count One is **dismissed without prejudice**.  In all other respects, the Motion is **denied**.  The Court finds that the exercise of personal jurisdiction over NMMC is proper, that venue lies in this judicial district, and that federal subject matter jurisdiction is present.

DONE and ORDERED this 2nd day of December, 2005.

s/ WILLIAM H. STEELE_____
UNITED STATES DISTRICT JUDGE