**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **BRENDA L. MORGAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL NO. 05-0499-WS-B** |
| | ) | |
| **NORTH MISSISSIPPI MEDICAL** | ) | |
| **CENTER, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter is before the Court on defendant's Motion for Summary Judgment (doc. 40). The Motion has been briefed, and is ripe for disposition at this time.[1]

**I.    Overview of the Case.**

Thomas Henry Morgan, Sr. ("Mr. Morgan") died in the early morning hours of September 1, 2003.  Ten days earlier, Mr. Morgan had sustained injuries in an accidental fall at a hunting camp near Calhoun City, Mississippi.  He was seen by the North Mississippi Medical Center, Inc. ("NMMC") Emergency Department in Tupelo, Mississippi on the day of his fall, and was subsequently admitted to NMMC, where he spent the next nine days.  The day before his death, Mr. Morgan was discharged by NMMC and conveyed by ambulance from NMMC to his home in Foley, Alabama, where he was left in the care of his wife.  Approximately 12 hours later, Mr. Morgan passed away from complications relating to his fall.

On August 26, 2005, plaintiff Brenda L. Morgan ("Morgan"), proceeding individually and as personal representative of Mr. Morgan's estate, filed suit against NMMC in this District Court.  The Complaint (doc. 1) alleged two causes of action, to-wit: (1) violation of the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. §§ 1395dd *et seq.*

---

[1]    Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically.  However, it has been entered only to decide the motion or matter addressed herein and is not intended for official publication or to serve as precedent.

("EMTALA") by failing to provide appropriate medical screening on August 30, 2003 (including failure to perform an MRI scan on Mr. Morgan's back), failing to provide the necessary treatment to stabilize Mr. Morgan's condition, and discharging him in a medically unstable condition; and (2) a state-law claim of outrage alleging that NMMC's conduct was intentional and/or reckless, was so extreme as to go beyond all possible bounds of decency, and caused Morgan to suffer severe emotional distress.

After service of process, NMMC filed a Motion to Dismiss (doc. 5) that raised jurisdictional and venue objections, while also maintaining that Morgan's EMTALA cause of action was not actionable on these facts, as a matter of law.  On December 5, 2005, the Court entered an Order (doc. 17) granting the Motion to Dismiss in part, but also denying it in part.  In particular, the December 5 Order dismissed the EMTALA claim to the extent that it was predicated on a failure-to-screen theory, but allowed that cause of action to proceed on a failure-to-stabilize theory to the extent that NMMC's admission of Mr. Morgan was alleged not to be in good faith or was a ruse to avoid EMTALA's requirements.  As a result of the December 5 Order, then, plaintiff's only remaining causes of action are an EMTALA failure-to-stabilize claim alleging that Mr. Morgan was not admitted in good faith in order to stabilize his emergency medical conditions, and a state-law outrage claim.  NMMC now seeks summary judgment.

## II.    Background Facts.[2]

### A.    *Medical Treatment.*

At approximately 6:15 p.m. on August 22, 2003, Mr. Morgan arrived at NMMC as a transfer patient from Calhoun City Hospital.  (NMMC Exh. A, at MO3-8.)[3]  Information

---

[2]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1217 (11th Cir. 2005).  Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in her favor.

[3]    NMMC has submitted exact duplicates of many medical records within multiple exhibits.  Because such redundancy hinders efforts to review the record and clutters the court file, submission of multiple copies of the same exhibits within the same summary judgment filings is generally to be avoided.  The same holds true for submission of copies of pleadings

received by NMMC in advance of his arrival was that Mr. Morgan was a 64-year old male who had sustained injuries in a 12-foot fall from a tree stand and who was in need of specialized trauma care.  (*Id.* at MO2-3.)  Upon arrival in the NMMC Emergency Department, Mr. Morgan's chief complaints were severe pain in his back, right shoulder and chest, and shortness of breath.  (*Id.* at MO8, 12.)  NMMC's emergency room undertook to provide emergency care to Mr. Morgan (who was in full spinal precautions) by taking a series of CT scans and conventional X-rays, performing a shoulder reduction, treating him with conscious sedation via morphine, and administering oxygen.  (*Id.* at MO6, 10-11, 13.)  Mr. Morgan's emergency room physician, John A. Cantrell, M.D., diagnosed him with a pulmonary contusion, multiple rib fractures, and right shoulder dislocation.  (*Id.* at MO14.)  Dr. Cantrell's notes from August 22 reflect that "[a]t this time, the patient is going to be admitted to Dr. Haigh in improved condition," based on the shoulder reduction procedure that had been performed to relocate his shoulder.  (*Id.*)

Roughly three hours after arrival at the emergency room, Mr. Morgan was admitted as a patient at NMMC.  (*Id.* at MO15.)  The admitting physician was Linda S. Haigh, M.D.  (*Id.* at MO13.)[4]  That evening, Dr. Haigh prepared a report reflecting that Mr. Morgan was "in no apparent distress, complaining of right shoulder pain which was somewhat eased after morphine."  (*Id.* at MO44.)  In examining his back, Dr. Haigh observed "no obvious trauma" and "a mild bruise on the right flank."  (*Id.*)  In examining the many CT scans and x-rays, Dr. Haigh opined that "Dorsal and lumbar spine were normal," "CT of the cervical spine was normal," and "CT of the abdomen and pelvis were normal," but that "CT of the chest demonstrates a small hemothorax with some rib fractures on the right."  (*Id.*)[5]  Given her diagnosis of Mr. Morgan as

previously filed in an action.

[4]     Dr. Haigh was not an employee of NMMC as of August 2003.  (Haigh Dep., at 131.)  It is undisputed, however, that she had admitting privileges at that facility during the relevant time period.

[5]     Dr. Haigh's assessment was not shared by Radiologist Eric Emig, who observed the same images and found a "compression fracture involving at least one of the lower thoracic vertebral bodies.  Compression fracture involving one of the upper lumbar vertebral bodies cannot be excluded."  (*Id.* at MO199, MO233.)  Similarly, plaintiff's expert, Dr. Morrison, maintains that the abdomen/pelvis CT scan was not negative, but was in fact positive for thoracic compression fractures.  (Morrison Dep., at 136-37.)  And defendant's expert, Dr. Carlton,

suffering from "some right pulmonary contusion, and a relocated shoulder," Dr. Haigh devised a treatment plan of "admission for pulmonary toilet and care of the pulmonary contusion," with "medications for pain control as needed." (*Id.* at MO45.) Dr. Haigh's admission record did not identify a compression fracture in Mr. Morgan's thoracic vertebrae, and there is no evidence that Dr. Haigh had diagnosed that condition at that time. (Morrison Dep., at 141-42.) Dr. Haigh did not delineate any specific treatment plan for the rib fractures.

For the next nine days, Mr. Morgan remained hospitalized at NMMC. During that time period, he was seen by his primary physician (Dr. Haigh), an orthopedist, a pain specialist and a neurosurgeon. (Haigh Dep., at 137.) He received physical therapy, respiratory therapy and occupational therapy, as well as nursing care and diagnostic studies, and was housed in a private room. (*Id.*) He was on oxygen throughout his hospital stay, at least in part because the rib fractures might render it difficult for him adequately to ventilate and oxygenate. (Carlton Dep., at 72-73.) Nonetheless, the medical records confirm that Mr. Morgan's hospitalization did not proceed smoothly. Following his admission, he continued to experience difficulty with his right shoulder, despite the reduction procedure that Dr. Cantrell had performed. On August 25, 2003, Mr. Morgan was seen by an orthopedist, Stephen R. Southworth, M.D., concerning his shoulder. Based on new x-rays, Dr. Southworth concluded that the shoulder had re-dislocated, and performed a closed reduction procedure under general anesthesia to attempt to relocate the shoulder. (NMMC Exh. B, at MO27, 54.)

In the ensuing days, tension emerged between Mr. Morgan and NMMC health care professionals. As Dr. Haigh wrote in her discharge summary, "[t]he patient maintained himself at bed rest despite our contraindications .... He refused physical therapy and refused assistance with out [*sic*] of bed. He refused to get up and go to the bathroom or use a urinal ...." (*Id.* at MO27.) Dr. Haigh expressed these concerns directly to Mr. Morgan, telling him that he had refused to do what she needed him to do to get better, and that a hospital was the worst place for

_____

testified that he "would not consider it negative when you have got compression fractures and when you have got a pulmonary contusion. Those are not negative findings." (Carlton Dep., at 29.) It is not clear from the record when, or if, Dr. Haigh learned of the radiologist's interpretations, but at some point during the hospitalization she became cognizant of Mr. Morgan's compression fracture.

him in his condition because of the high incidence of disease and germs.  (Morgan Dep., at 123-24.)  Dr. Haigh "really wanted to get this guy up" because of the medical risks he faced if he remained supine in his hospital bed for a prolonged time period.  (Haigh Dep., at 78.)  Additionally, physician progress notes and physical therapy notes reflect that Mr. Morgan failed to follow physician instructions about immobilizing his right arm and keeping it in a sling and swathe, contributing to ongoing shoulder pain.  (NMMC Exh. B, at MO90, MO159.)  Physical therapy was a particular point of contention, as his physical therapist noted on August 26, 2003 that Mr. Morgan "is poorly motivated to participate in therapy at this time and puts forth no effort whatsoever to asst with any type of bed mobility."  (*Id.* at MO159.)  For his part, however, Mr. Morgan complained that his lower back hurt too much for him to move, and endured severe pain even when his bed was elevated to 45 degrees.  (*Id.*)  Physical therapy was again attempted the following day, with similar results.  (*Id.* at MO160-61.)  By August 29, 2003, NMMC therapists and Dr. Southworth agreed that Mr. Morgan should be discharged from physical therapy because of his noncompliance.  (*Id.* at MO163.)[6]

On August 28, 2003, Dr. Haigh consulted with George M. Hammitt, M.D., concerning Mr. Morgan's lumbar back pain.  (*Id.* at MO48.)  Dr. Haigh consulted Dr. Hammitt because Mr. Morgan was complaining of chronic back pain, for which he had been receiving epidural steroid injections from his regular doctor in Foley, Alabama since receiving an MRI five years earlier.  (*Id.* at MO27.)[7]  Dr. Hammitt noted the compression fracture in Mr. Morgan's lower thoracic

---

[6]       Morgan testified that Dr. Haigh had encouraged Mr. Morgan to get out of bed to mitigate the risk of various health problems that could emerge if he remained motionless in his hospital bed.  (Morgan Dep., at 108.)  According to Morgan, physical therapists came to Mr. Morgan but he was unable to get up and walk, so the therapy was limited to massaging his legs and feet.  (*Id.* at 109.)  In this regard, the evidence most favorable to the plaintiff reflects that Mr. Morgan did not comply with physical therapists' requests not because he was being disobedient or contrarian, but because he was in such excruciating pain that he was physically unable to sit at the edge of his bed, and the like, when requested to do so.  (Morgan Dep., at 116-17; Morrison Dep., at 155.)

[7]       Dr. Haigh's understanding was that Mr. Morgan had "chronic back pain, which he has been treated in the past and stated there is nothing that they can do."  (Haigh Dep., at 74.)  According to Dr. Haigh, Mr. Morgan advised her, "this is my same back pain that responds to epidural," rather than a new condition arising from his 12-foot fall.  (*Id.* at 78.)  She further

region, observed that he was complaining of "significant pain over the thoracic and lumbar region," and "[w]ould recommend MRI of the thoracic and lumbar spine," as well as an epidural steroid injection. (*Id.* at MO48-49.) Dr. Hammitt successfully performed the epidural injection on August 29, 2003, with diagnoses of degenerative disk disease and compression fracture. (*Id.* at MO66.)[8] However, Mr. Morgan refused the MRI, but instead requested additional pain control. (*Id.* at MO27.) Mr. Morgan complained of significant back pain throughout his hospitalization. (Carlton Dep, at 45.)

Plaintiff's expert, Dr. Morrison, is sharply critical of the treatment administered by NMMC. He opined that an MRI should have been done with respect to the compression fractures, that the rib fractures "should have warranted further looking," that an additional CT scan should have been performed to rule out laceration of spleen or liver, and that neurological examinations should have been performed on a daily basis. (Morrison Dep., at 140.) Dr. Morrison criticizes NMMC for not recommending the MRI of the thoracolumbar spine until August 28, six days after Mr. Morgan's admission. (*Id.* at 151.) According to Dr. Morrison, "to do what was needed for the patient from his initial emergency injuries from the fall would have been have the epidural or the epidural and the MRIs done as Dr. Hammitt recommended." (*Id.* at 157.) Had the MRI been done, Dr. Morrison opined, "the risk of death could have been reduced. If the spinal cord injury had been known about, the patient would have been sent to a rehab facility and not been sent home." (*Id.* at 173.)

During the nine days that Mr. Morgan was treated by NMMC, the total hospital charges

---

testified that, while Mr. Morgan's compression fractures constituted part of an emergency medical condition, her conclusion was that they were "likely old," or part of a pre-existing ailment that predated the accident. (*Id.* at 46, 48.) In Dr. Haigh's view, there was "no treatment" appropriate for these "old compression fractures" because they were "stable" and included "no neurologic deficit." (*Id.* at 48.) She elaborated that the x-ray films were "normal" because they did not reveal "little pieces missing" from the compressed vertebral bodies. (*Id.*) Had such pieces been missing, Dr. Haigh testified, worries would arise about "impingement on the spinal canal" and "neurologic deficit." (*Id.*) But in her view, the medical evidence at the time of Mr. Morgan's treatment did not support these concerns.

[8]     In the operative notes for this procedure, Dr. Hammitt noted the "long history of lumbar pain" that Mr. Morgan had experienced, and indicated that CT scan and plain film x-rays should be reviewed to "make sure no fracture." (*Id.*)

he incurred were $24,945, including multiple x-ray charges in excess of $1,000 each and a daily $380 charge for a private room.  (NMMC Exh. A, at MO236-40.)  Approximately two-thirds of these charges were incurred post-admission.

**B.      Defendant's Knowledge of Mr. Morgan's Ability to Pay.**

On the morning of August 23, 2003, roughly 12 hours after Mr. Morgan was admitted, his wife was summoned to the NMMC business office.  At that time, she was asked how the Morgans intended to pay the charges for Mr. Morgan's hospital stay.  (Morgan Dep., at 60-61.) Morgan was informed, "if you don't have the money to pay the bill, then you'll have to seek a finance company."  (*Id.* at 62.)  The NMMC employee with whom Morgan met indicated that she did not normally work Saturdays, but that sometimes she did have to do so.  (*Id.*)  It is undisputed, however, that NMMC's patient account department is regularly open on Saturdays from 8 a.m. to 12 p.m., and that Saturday, August 23, 2003, was a day on which that employee was regularly scheduled to work.  (Emens Aff., ¶¶ 4, 5.)  Aside from the August 23 meeting and one other occasion on which a nurse informed Morgan that a certain treatment would cost $75, no NMMC physician, nurse, administrator, employee or agent mentioned any financial matters to the Morgans during Mr. Morgan's nine-day hospitalization.  (Morgan Dep., at 60.)[9]

Dr. Haigh testified that at no time during her care and treatment of Mr. Morgan was she ever aware that he did not have health insurance or of his ability or inability to pay for treatment. (Haigh Dep., at 132.)  She had no knowledge and no information as to whether Mr. Morgan would or would not be able to pay for these services.  (*Id.* at 138.)  To be sure, NMMC's records do include a computerized admission/discharge record with a handwritten notation in the margins "son owns property - just hunting grounds no ins."  (Plaintiff's Exh. 6, at MO257.)  The undisputed evidence reveals, however, that this page was extracted from NMMC's business office records, and not from a medical file.  There is no indication that Dr. Haigh or any other health care professional treating Morgan was aware at any time during his inpatient stay at NMMC that he was uninsured.

---

[9]      Plaintiff's expert, E. Scott Morrison, D.O., testified that it is typical for a patient or family member to go to the hospital's business office to complete certain paperwork upon admission, and that a routine inquiry during that process concerns payment arrangements for charges incurred during the hospitalization.  (Morrison Dep., at 61-62.)

### C.     Discharge of Mr. Morgan.

Although the evidence on this point is contested, plaintiff's position is that NMMC began attempting to discharge Mr. Morgan almost from the moment that he was admitted.  On August 23, the day after his admission, Dr. Haigh told Morgan that her husband was doing well and would probably be discharged the following morning.  (Morgan Dep., at 224.)[10]  On August 27, Dr. Haigh again informed Morgan that Mr. Morgan was "ready to be discharged," but he was not discharged at that time.  (*Id.* at 232.)  Morgan complains that in neither the August 23 nor the August 27 conversations did Dr. Haigh mention vertebral fractures.  (*Id.* at 232-33.)  Plaintiff suggests that NMMC intended to discharge Mr. Morgan at various times prior to August 31, 2003, but does not proffer evidence that NMMC ever took tangible steps to effectuate that intent.[11]  It is undisputed that he was never discharged between August 22 and August 31, and that he continuously received medical care as an inpatient at NMMC throughout that time period.

The medical records confirm that a "discharge planning screening" was initiated for Mr. Morgan at 11:33 p.m. on August 22, 2003, mere hours after his admission.  (Plaintiff's Exh. 6, at MO25.)  These records further state that NMMC staff spoke with Mr. Morgan regarding potential needs at discharge as early as the morning of August 23, and that there were also discussions concerning Mr. Morgan on "discharge planning rounds" on August 27.  (*Id.*)  However, the evidence in the summary judgment record is that it is entirely typical and routine for discharge planning to begin shortly after a patient's admission.  (Haigh Dep., at 133.)  Dr. Haigh indicated that discharge screening conferences may occur well before a patient's

---

[10]     For her part, Dr. Haigh has no recollection of any such discussion, but she does not dispute that it occurred.  (Haigh Dep., at 52.)  That said, she opined that any statement to Morgan that the patient might be ready for discharge on August 24 was inconsistent with the facts, given her plan to consult with Dr. Southworth concerning Mr. Morgan's shoulder, as well as ongoing issues concerning the catheter and oxygen for the pulmonary contusion.  (*Id.*)

[11]     For example, plaintiff's proffered deposition excerpts devote significant attention to characterizing and debating the significance of an alleged discharge order of August 28, 2003. The record contains multiple unsigned, partial copies of discharge orders, including one order apparently created on August 27 for discharge on August 28 (Plaintiff's Exh. 6, at MO31), but there is no evidence that these orders were ever implemented.

discharge, as nurses and other hospital personnel attempt to anticipate the discharge needs of the patient.  (*Id.* at 134.)[12]

According to Dr. Haigh, no one in administration or risk management at NMMC had input into the decision to discharge Mr. Morgan, nor did they pressure her with respect to that decision.  (Haigh Dep., at 132-33.)  Nonetheless, she does acknowledge that she met with NMMC's risk management department concerning Mr. Morgan, but only because "[h]e was refusing physical therapy and nursing care."  (*Id.* at 77.)  In light of his perceived lack of cooperation, Dr. Haigh was concerned that Mr. Morgan was not improving as rapidly as he should and that the hospital environment might not be beneficial to him.  (*Id.* at 78.)  As of August 27, Dr. Haigh's "plan was to get him home in the next few days."  (*Id.* at 74.)  On August 28, she prepared discharge paperwork for Mr. Morgan; however, she did so as a courtesy to her partner, Dr. Orgler, because Dr. Haigh would not be working over the weekend and she wanted to save Dr. Orgler the trouble of preparing the discharge paperwork if he elected to discharge Mr. Morgan.  (*Id.* at 96-97.)  In her words, Dr. Haigh was merely "getting everything ready for him to go home in the next few days," as of August 28.  (*Id.* at 97.)  She would not have discharged him on the 28th because Mr. Morgan was still awaiting an epidural steroid injection and consultation by Dr. Hammitt.  (*Id.* at 97-98, 100.)

Mr. Morgan was discharged from NMMC on August 31, 2003.  Morgan testified that Dr. Haigh explained that it was necessary to discharge Mr. Morgan because he was "too big of a risk," because he might get pneumonia or blood clots in his current condition if he remained at the hospital.  (Morgan Dep., at 116.)  In discharging Mr. Morgan, Dr. Haigh "was motivated mostly by his refusal to work with physical therapy although we knew that he was neurologically intact and his inability to cooperate with the nurses," prompting her to conclude that "he would do better in his own home environment."  (Haigh Dep., at 137.)  NMMC medical notes indicate

---

[12]     This testimony is reinforced by defendant's expert, Frederick B. Carlton, Jr., M.D., who indicated that such advance discharge planning "is pretty standard procedure" and that hospitals commence discharge planning "as soon as they could after the patient was admitted," without regard to ability to pay.  (Carlton Dep., at 98.)  "[U]sually within twenty-four hours in my experience discharge planning is begun."  (*Id.* at 99-100.)  Upon prodding about discharge planning as little as one hour after admission, Dr. Carlton stated, "It doesn't strike me as unusual in the least."  (*Id.* at 100.)

that Mr. Morgan was "given strict instructions for follow-up with his physicians in Mobile, Alabama," after which "he was discharged to home in stable condition" on August 31, 2003. (NMMC Exh. B at MO27-28.)[13]  Although Dr. Haigh was not providing treatment to Mr. Morgan when he was discharged home, her opinion is that he was discharged in stable condition, and that Mr. Morgan had reached the point in his treatment at NMMC where continued care could reasonably be performed on an outpatient basis.  (Haigh Dep., at 118-19.)  Dr. Haigh also indicated that, at the time of Mr. Morgan's discharge, "his pain caused him to be reluctant to get up and he refused to get up."  (*Id.* at 119.)

Mr. Morgan's discharge order dated August 30, 2003 provided that he was to be discharged to home when an ambulance service become available, and that transportation by ambulance was medically necessary because immobilization was required.  (Plaintiff's Exh. 6, at MO36.)  The NMMC ambulance ride from Tupelo, Mississippi to Foley, Alabama on August 31, 2003 lasted approximately five and a half hours, and Mr. Morgan remained on oxygen for the duration of the trip.  (*Id.* at MO41.)  The Morgans were home by 4:15 p.m. that day.  (Morgan Dep., at 178.)  The EMTs left Mr. Morgan in his bed, in the care of his family.  (*Id.* at 179.)  The record is devoid of any indication that the ambulance personnel treated Mr. Morgan discourteously or unprofessionally; to the contrary, plaintiff testified that, at the conclusion of the ambulance ride, Mr. Morgan insisted that she pay the ambulance drivers a generous tip of $50 to buy their dinners, calling them "the nicest two people I've ever seen."  (*Id.* at 178-79.)

On the morning of September 1, 2003, just hours after the ambulance brought him home, Mr. Morgan died.  An autopsy determined that the cause of death was multiple blunt force injuries arising from his fall, and complications from same.  (Plaintiff Exh. 5.)

**III.    Summary Judgment Standard.**

Summary judgment should be granted only if "there is no issue as to any material fact

---

[13]    At the time of discharge, Dr. Southworth at NMMC called Mr. Morgan's doctors in Alabama, advised them of Mr. Morgan's treatment and back problems, and requested that they see him promptly upon his return home.  (Morgan Dep., at 129.)  Dr. Southworth relayed a message from the Alabama physicians that Morgan should call their office on the first business day after returning home, so that arrangements could be made to see Mr. Morgan expeditiously. (*Id.*)

and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The
party seeking summary judgment bears "the initial burden to show the district court, by reference
to materials on file, that there are no genuine issues of material fact that should be decided at
trial."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party
has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a
genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing
on an essential element of her case with respect to which she has the burden of proof,' the
moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S.
317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden,
the court must stop short of weighing the evidence and making credibility determinations of the
truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable
inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999
(11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only
for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon
Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

**IV.   Analysis.**

Plaintiff is pursuing two causes of action: an EMTALA claim predicated on failure to
stabilize, and a state-law outrage claim.  Defendant maintains that it is entitled to entry of
judgment in its favor as a matter of law on both claims.

**A.   *EMTALA Claim.***

**1.   *Applicable Legal Standard.***

The Eleventh Circuit has explained that EMTALA is violated "when a hospital either
fails to adequately screen a patient, or discharges or transfers the patient without first stabilizing
his emergency medical condition."  *Kizzire v. Baptist Health System, Inc.*, 441 F.3d 1306, 1310
(11th Cir. 2006).  Plaintiff's failure-to-screen theory having been rejected at the Rule 12(b) stage,
her EMTALA claim rests exclusively on a failure-to-stabilize rationale.

Both applicable regulations and this Court's previous rulings in this case shed
considerable light on the necessary showing for an EMTALA stabilization claim.  In particular,
implementing regulations provide that "[i]f a hospital has screened an individual ... and found
the individual to have an emergency medical condition, and admits that individual as an inpatient

-11-

in good faith in order to stabilize the emergency medical condition, the hospital has satisfied its special responsibilities" under EMTALA.  42 C.F.R. § 489.24(d)(2)(i).  A straightforward reading of this regulation is that admission of an individual as an inpatient is a complete defense to an EMTALA failure-to-stabilize claim, provided that the hospital does so in good faith in order to stabilize the emergency condition.  Along those lines, this Court has held that "the EMTALA obligation to stabilize a patient ceases at the time of the patient's admission as an inpatient, *unless* the hospital fails to admit the patient in good faith or does so as a subterfuge to avert EMTALA liability."  *Morgan v. North Mississippi Medical Center, Inc.*, 403 F. Supp.2d 1115, 1130 (S.D. Ala. 2005).[14]  Neither party has challenged the propriety of that legal standard for evaluating NMMC's stabilization defense to the EMTALA stabilization cause of action; therefore, the Court will utilize it here.

> 2.    *The Good-Faith Admission Defense.*

NMMC has presented abundant evidence that it admitted Mr. Morgan in good faith in order to stabilize the emergency medical conditions with which it had diagnosed him.  Upon arriving in the Emergency Room, Mr. Morgan was diagnosed with a pulmonary contusion, multiple rib fractures and a right shoulder dislocation.  He received emergency treatment for his shoulder, and was admitted to NMMC for a pulmonary contusion and relocated shoulder, with a plan of administering oxygen and pain medications, and caring for the contusion.  Mr. Morgan remained an inpatient at NMMC for more than a week, and received treatment for his shoulder, as well as pain medication, oxygen, and physical therapy, from Dr. Haigh and several NMMC specialists.  Six days into Mr. Morgan's hospitalization, Dr. Haigh consulted with a pain specialist concerning Mr. Morgan's lower back pain, which she regarded as recurrence of a chronic condition for which the patient had long been treated in Alabama.  The pain specialist administered an epidural injection and recommended an MRI to investigate Mr. Morgan's back

---

[14]    *See also Bryant v. Adventist Health Systems/West*, 289 F.3d 1162, 1168-69 (9th Cir. 2002) (holding that "EMTALA's stabilization requirement ends when an individual is admitted for inpatient care," unless "a patient demonstrates in a particular case that inpatient admission was a ruse to avoid EMTALA's requirements"); *Mazurkiewicz v. Doylestown Hosp.*, 305 F. Supp.2d 437, 447 (E.D. Pa. 2004) ("the most persuasive synthesis of the law on admission as a defense to EMTALA liability is that admission is a defense so long as admission is not a subterfuge").

-12-

pain further; however, Mr. Morgan refused the MRI.  Mr. Morgan was discharged after nine days, based on his physicians' assessment that the hospital environment was not a good place for him because he was not participating in physical therapy to a significant degree, was not moving in his bed, and was at risk for a host of serious medical maladies (blood clots, bed sores, pneumonia, and the like).  Mr. Morgan's hospital charges from his stay at NMMC exceeded $24,000.  This undisputed evidence raises a compelling inference that NMMC admitted Mr. Morgan in good faith and not as a subterfuge to shirk EMTALA responsibilities.

In opposition to summary judgment, plaintiff's principal argument is that the good-faith admission defense is unmerited here because Dr. Haigh did not admit Mr. Morgan "in order to stabilize the emergency medical condition," as required by EMTALA.  Plaintiff points to medical records showing that, at the time of Mr. Morgan's admission, Dr. Haigh did not diagnose the vertebral compression fractures, misread applicable CT scans and x-ray films as "normal" even though they reflected these fractures, and admitted Mr. Morgan not to treat his emergency conditions related to rib fractures and compression fractures, but instead to treat the pulmonary contusion and the dislocated shoulder.  Simply put, then, plaintiff's argument is that NMMC violated EMTALA because it did not admit Mr. Morgan in order to treat one set of emergency conditions (*e.g.*, rib and vertebral compression fractures), but instead admitted him in order to treat another set (*e.g.*, a pulmonary contusion and dislocated shoulder).  This position misapprehends the ambit and scope of EMTALA.

On this point, the Court finds the decision in *Vickers v. Nash General Hosp., Inc.*, 78 F.3d 139 (4th Cir. 1996), to be quite instructive.  In *Vickers*, a hospital examined the decedent in the emergency room, diagnosed him with a lacerated scalp and contusions, and admitted him for treatment.  Four days after he was discharged, the decedent died of a cerebral herniation and epidural hematoma produced by an undiagnosed skull fracture.  The decedent's estate sued the hospital under EMTALA for failure to stabilize the skull fracture.  In rejecting the stabilization claim, the Fourth Circuit opined as follows:

> "On its face, [EMTALA] takes the actual diagnosis as a given, only obligating hospitals to stabilize conditions that they actually detect. ... [A] stabilization claim exists when the patient had an emergency condition and the hospital *actually knew of that* condition. ... The Act does not hold hospitals accountable for failing to stabilize conditions of which they are not aware, or even conditions of which

> they should have been aware.  EMTALA would otherwise become coextensive
> with malpractice claims for negligent treatment."

*Vickers*, 78 F.3d at 145 (citations omitted).  In response to the plaintiff's claim that the hospital

had violated EMTALA by failing to stabilize the decedent's emergency condition (*e.g.*, his skull

fracture), the Fourth Circuit disagreed, saying that the hospital had diagnosed him as suffering

from a laceration and repaired same.  The allegation that the hospital failed to stabilize the

emergency medical condition "is thus in error" because it "fails once again to take the actual

diagnosis as a given."  *Id.*  As for the plaintiff's attempt to impose EMTALA liability by

hindsight, arguing that the hospital failed to stabilize what, in hindsight, turned out to be a

serious condition, *Vickers* explained that analysis by hindsight cannot impose EMTALA

liability; rather, "a hospital must actually perceive the seriousness of the medical condition and

nevertheless fail to act to stabilize it."  *Id.*  Citing the "lamentable outcome" for the decedent, the

*Vickers* court stressed that "both the diagnosis and treatment may form the basis of state

malpractice claims.  Failure to stabilize claims under EMTALA are different, however, as

Congress deliberately left the establishment of malpractice liability to state law."  *Id.*

      More generally, the law is clear that EMTALA does not establish a federal medical

malpractice cause of action.  *See Harry v. Marchant*, 291 F.3d 767, 770 (11th Cir. 2002)

(EMTALA "was not intended to be a federal malpractice statute"); *Hoffman v. Tonnemacher*,

425 F. Supp.2d 1120, 1130 (E.D. Cal. 2006) ("EMTALA does not establish a federal malpractice

cause of action nor does it establish a national standard of care."); *Morgan*, 403 F. Supp.2d at

1124 ("Courts have universally recognized that EMTALA was not conceived as a federal

medical malpractice statute.").  Claims that a physician or other health care provider failed

properly to detect or discern the existence or severity of an emergency medical condition are not

generally redressable under EMTALA, but are instead relegated to the state-law province of

medical malpractice law.  *See, e.g., Marshall v. East Carroll Parish Hosp. Service Dist.*, 134

F.3d 319, 323 (5th Cir. 1998) ("a treating physician's failure to appreciate the extent of the

patient's injury or illness, as well as a subsequent failure to order an additional diagnostic

procedure, may constitute negligence or malpractice, but cannot support an EMTALA claim").[15]

Taking the evidence in the light most favorable to Morgan, Dr. Haigh omitted rib fractures or compression fractures from her original treatment plan for Mr. Morgan. Plaintiff says this vitiates the good-faith admission defense to EMTALA liability because it establishes that NMMC did not admit Mr. Morgan in order to stabilize those specific conditions. As *Vickers* makes clear, however, for EMTALA purposes the diagnosis is taken as a given. EMTALA looks to whether the patient was admitted to stabilize the specific medical conditions that were actually diagnosed, not to whether the hospital properly identified all medical conditions at that time. EMTALA does not impose liability for failure to stabilize emergency medical conditions that either were not detected or whose severity was not appreciated by the hospital. The record raises several reasonable inferences as to why the compression fractures were excluded from Dr. Haigh's written diagnosis and treatment plan upon admission. The admission notes suggest that she misread the x-rays and CT scans and simply did not see the fractures. Her deposition testimony states that her assessment was that the compression fractures were old injuries requiring no treatment. Either way, plaintiff's dissatisfactions with Dr. Haigh lie squarely in the realm of improper diagnosis or treatment, and are outside the scope of EMTALA.[16] It is

---

[15]    *See also Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776 (6th Cir. 2003) (finding that every circuit to consider the question has required actual knowledge of the patient's emergency condition as a precondition to an EMTALA duty to stabilize); *Jackson v. East Bay Hospital*, 246 F.3d 1248, 1257 (9th Cir. 2001) (adopting "actual detection" rule under which condition precedent to stabilization requirement is that hospital had actual knowledge of emergency medical condition, and dispelling notion that hospital had EMTALA duty to stabilize undiagnosed condition where hospital treated only emergency condition it detected); *Hoffman*, 425 F. Supp.2d at 1130 (there is no violation of EMTALA where a hospital "fails to detect or misdiagnoses an emergency condition, and the remedy of a person so injured is through a state law medical malpractice claim"); *Stringfellow v. Oakwood Hosp. and Medical Center*, 409 F. Supp.2d 866, 871 (E.D. Mich. 2005) ("If the emergency nature of the condition is not detected, the hospital cannot be charged with failure to stabilize a known emergency condition.").

[16]    This point is clarified by the testimony of plaintiff's expert that "[i]f the spinal cord injury had been known about, the patient would have been sent to a rehab facility and not been sent home." (Morrison Dep., at 173.) Plainly, then, at the heart of plaintiff's theory of the case is the notion that NMMC should have known that Mr. Morgan had a spinal cord injury, that it did not know, and that the possession of such information would have prompted NMMC to take different stabilizing action. In the absence of any suggestion that NMMC violated its

undisputed that Dr. Haigh did diagnose Mr. Morgan with a pulmonary contusion and dislocated shoulder.  The relevant question for EMTALA purposes is not whether all of Mr. Morgan's serious health problems were identified as bases for admission, but whether he was admitted in good faith to stabilize those medical conditions that were diagnosed.  There can be no dispute that he was admitted to NMMC for the purpose of receiving treatment to stabilize those conditions, and that NMMC did in fact treat him for those diagnosed emergency conditions.[17]  That there may have been other conditions that his admitting physician failed to diagnose or whose severity she did not grasp, and that he was not admitted in order to stabilize, cannot support an EMTALA claim, as a matter of law.[18]

       3.       *Defendant's Attempts to Treat Mr. Morgan's Back Pain.*

Any suggestion that NMMC admitted Mr. Morgan in bad faith and with no intent to treat

---

screening obligations to Mr. Morgan, however, this is not a valid or viable EMTALA theory.

[17]     In that regard, plaintiff's expert concedes that "there is no evidence that [Mr. Morgan] was admitted for any purpose other than for him to receive treatment for his injuries." (Morrison Dep., at 64.)  Later in his testimony, however, Dr. Morrison also opines that, at the time of Mr. Morgan's admission, NMMC officials "were not intending to stabilize the patient or give proper treatment for the initial emergency conditions."  (Morrison Dep., at 172.)  As the Court reads these statements, taken in the context of the deposition testimony, plaintiff is complaining not that NMMC admitted him with no intent to treat and stabilize his injuries, but is rather that NMMC was intending to stabilize only the dislocated shoulder and pulmonary contusion, rather than the fractures.  Once again, this dissatisfaction with Dr. Haigh's diagnosis or treatment plan may or may not rise to the level of negligence or medical malpractice under state law, but it is not actionable under EMTALA.

[18]     The analysis might be different if Morgan had mustered evidence that Dr. Haigh knew of the compression fractures, appreciated their severity, and simply turned a blind eye to them to save NMMC the expense of treating them.  In that event, an inference of failure to act in good faith might be presented, which would preclude the admission defense to EMTALA failure-to-stabilize liability.  But the record here is devoid of any such evidence.  To the contrary, Dr. Haigh's admission records classify the CT scans as normal, suggesting that she simply missed the compression fractures.  Moreover, in her deposition, Dr. Haigh explained that when she did perceive the compression fractures, her assessment was that they were old (*i.e.*, not related to the 12-foot fall) and non-displaced, and that no treatment was necessary.  Such an assessment may or may not have been incorrect, negligent or otherwise culpable under state law, but it does not support an inference that Dr. Haigh was willfully ignorant of this medical condition to avoid having to treat and stabilize it.

-16-

his vertebral compression fractures is undermined by events that transpired during his hospitalization. At some point while Mr. Morgan was an in-patient, Dr. Haigh and NMMC began orienting his treatment towards ameliorating his back pain symptoms. To that end, he was prescribed a regimen of physical therapy and pain medication, and was referred to a pain specialist, Dr. Hammitt. Upon examining Mr. Morgan, Dr. Hammitt specifically noted the compression fracture, acknowledged his complaints of significant lower back pain, and recommended a course of stabilization treatment to include an epidural steroid injection and an MRI of the thoracic and lumbar spine. With Mr. Morgan's consent, the epidural steroid injection was performed on August 29, 2003. The MRI was never done. The uncontroverted evidence is that NMMC did not perform an MRI on Mr. Morgan because he declined the procedure.

Considered in the aggregate, these facts deal a crushing blow to plaintiff's EMTALA stabilization theory. Plaintiff suggests that Mr. Morgan's admission was a ruse and that NMMC never intended to treat his compression fractures, but the record is quite clear that NMMC did in fact attempt to treat that condition during his hospitalization, via pain medication, physical therapy, an epidural injection, and a recommendation of an MRI. Such actions are irreconcilable with a subterfuge theory of liability. Far from reflecting a bad-faith design not to treat his compression fracture, this evidence unequivocally shows that NMMC specifically endeavored to provide such treatment and stabilization. EMTALA requires nothing more. That Morgan may believe that such treatment efforts should have been initiated sooner in Mr. Morgan's hospitalization might be actionable under state law, but it absolutely does not state a viable claim under EMTALA.

Even more problematic from plaintiff's standpoint, the only stabilizing treatment that plaintiff's expert opined should have been performed with respect to the compression fractures was an MRI of the thoracic and lumbar spine. According to plaintiff's expert, the results of that MRI would have revealed more serious problems, prompting NMMC to discharge Mr. Morgan to a rehabilitation unit, rather than to his home. But this argument smacks of a critique of the treatment path selected by NMMC, not an allegation that NMMC did not admit Mr. Morgan in good faith in order to treat his conditions. This is not a basis for EMTALA liability. Even if it were, the fundamental defect in plaintiff's contentions relating to the failure to provide an MRI is that NMMC recommended an MRI of Mr. Morgan's back, but he refused this treatment.

-17-

EMTALA is not violated by virtue of a hospital's failure to provide a diagnostic tool that the patient refuses, yet that is essentially what Morgan argues here.

Given the clear, uncontroverted evidence that NMMC endeavored to treat and stabilize Mr. Morgan's lower back pain, and that Mr. Morgan refused the one procedure that plaintiff's expert claims the hospital failed to provide, plaintiff cannot proceed on her EMTALA stabilization claim based on a theory that NMMC's admission of Mr. Morgan was a ruse to avoid stabilizing Mr. Morgan's vertebral fractures.[19]

### 4.     Plaintiff's Evidence of Subterfuge.

In a further attempt to make the requisite showing of subterfuge or bad faith, plaintiff contends that various ancillary facts raise that inference.  She points to evidence that she claims establishes that NMMC was making plans to discharge Mr. Morgan on the very evening that he was admitted to the hospital.  This evidence consists of a one-line entry stating "Discharge Planning Screening."  (Plaintiff's Exh. 6, at MO25.)  That same document reflects that discharge communications occurred on August 23, and again on August 27.  (*Id.*)  Viewing this evidence in the light most favorable to plaintiff, it does not raise an inference of any nefarious conduct or improper intent.  The undisputed testimony is that it is entirely commonplace and routine for hospitals to begin discharge planning immediately after a patient is admitted, without regard to the probable discharge date.  It would therefore be unreasonable to infer from the fragmentary

---

[19]     With respect to the rib fractures, Dr. Haigh did mention these in the admission paperwork.  But the record is devoid of any suggestion that NMMC should have taken further action to treat or stabilize them, much less an identification of what those stabilizing measures might have been.  Nor is there any evidence that the rib fractures had not been stabilized at the time of Mr. Morgan's discharge.  Even if the rib fractures were not stabilized, the relevant EMTALA question is whether NMMC admitted Mr. Morgan as an inpatient on August 22, 2003 in bad faith and without intending to treat his serious medical conditions.  Plaintiff has come forward with no evidence or argument that NMMC's failure to engage in a particular protocol or procedure with respect to the rib fractures evinces a bad-faith subterfuge in admitting Mr. Morgan.  At most, the Court is left with Dr. Morrison's conclusory statement that NMMC officials "were not intending to stabilize the patient or give proper treatment for the initial emergency conditions."  (Morrison Dep., at 172.)  Assuming that Dr. Morrison is competent to render expert opinions as to what NMMC did or did not intend to do upon admitting Mr. Morgan, this opinion is so conclusory and unsupported by record evidence that it would not reasonably be of assistance to a finder of fact and cannot defeat defendant's motion for summary judgment.  (Rule 702, Fed.R.Evid.)

notes in the medical records that NMMC was malevolently scheming to expel Mr. Morgan within hours after his arrival to evade EMTALA stabilization duties.

Next, Morgan proffers evidence that at various times prior to August 31, 2003, the hospital initiated discharge proceedings for her husband, or otherwise expressed an intent to do so shortly. For example, plaintiff's evidence is that on the morning of August 23, 2003, Dr. Haigh advised that Mr. Morgan would soon be ready for discharge. Moreover, a discharge order was actually prepared on August 27, for dismissal on August 28. Plaintiff relies on numerous alleged inconsistencies in Dr. Haigh's testimony regarding the August 27 discharge order.[20] But none of this evidence, even viewed in the light most favorable to plaintiff, establishes that Mr. Morgan's admission to NMMC was a mere ruse or subterfuge. Despite the statements attributed to Dr. Haigh on August 23, the August 27 discharge order, and the discharge planning notes commencing as early as August 22, Mr. Morgan was never discharged until August 31, 2003, fully nine days after his admission. He received substantial ongoing medical care and treatment for the duration of his hospitalization. That the hospital may have been discussing plans for Mr. Morgan's discharge within hours of his admission is an unremarkable fact indicative of routine hospital administration practices. That Dr. Haigh may have informed Morgan on August 23 that Mr. Morgan should be ready to go home soon does not raise an inference that NMMC did not intend to treat him, particularly where NMMC proceeded to provide nine uninterrupted days of treatment. That discharge orders may have been prepared prior to August 31 and not effectuated, for unknown reasons, does not, without more, reflect an evasive or improper intent.[21] In short,

---

[20]    There is no direct evidence in the record explaining why NMMC did not move forward with Mr. Morgan's discharge prior to August 31. Whatever the reasons might have been, there is no suggestion that some cataclysmic event prompted NMMC to change its mind or that the decision not to proceed with discharge was anything other than a voluntary decision made exclusively by Dr. Haigh and the NMMC medical team.

[21]    Plaintiff's expert opines that the purported order by Dr. Haigh to discharge Mr. Morgan on August 28, 2003 "was a violation of EMTALA because the hospital was not doing everything possible to stabilize that patient." (Morrison Dep., at 158.) It is the function of this Court, not plaintiff's expert witness, to construe, interpret and apply EMTALA to these facts; therefore, Dr. Morrison's opinion on the strictly legal question of whether the record facts amount to an EMTALA violation is entitled to no weight. *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1112 n.8 (11th Cir. 2005) (explaining that

none of this evidence, as presented here and as viewed most favorably to Morgan, can sustain an inference that Mr. Morgan was not admitted in good faith in order to treat his emergency medical conditions of which the hospital was aware.

In a further effort to establish that NMMC violated EMTALA, plaintiff suggests that Dr. Haigh knew of Mr. Morgan's uninsured status and relied on discussions with NMMC's risk management department to make the discharge decision. The summary judgment record is to the contrary. Morgan met with NMMC's financial personnel on the morning of August 23 and divulged her husband's lack of insurance and apparent inability to pay; however, plaintiff makes no showing that this meeting was improper or otherwise adverse to the treatment and care of Mr. Morgan. *See generally Kizzire*, 441 F.3d at 1310 (questioning about an individual's insurance status does not violate EMTALA if it does not delay screening or treatment); 42 C.F.R. § 489.24(d)(4)(iv) ("Hospitals may follow reasonable registration processes ... including asking whether an individual is insured and, if so, what that insurance is, as long as that inquiry does not delay screening or treatment."). Dr. Haigh testified that at no time before Mr. Morgan's discharge was she ever aware of his financial status or his ability to pay. Plaintiff attempts to discredit this testimony in two respects. First, she points to a medical record with a handwritten note that "son owns property - just hunting grounds no ins." But this document was culled from NMMC's business office records, not from any patient file that Dr. Haigh reviewed in treating Mr. Morgan. Second, plaintiff would impute wrongdoing to Dr. Haigh's meeting with risk management concerning Mr. Morgan; however, the undisputed testimony reflects that such meeting was confined to Mr. Morgan's alleged refusal to participate in physical therapy, and that neither risk management nor any other hospital administrative department had any input in the decision to discharge him. None of this evidence supports a theory that NMMC's admission of Mr. Morgan was a subterfuge or proceeded without good faith.

     *5.    Conclusion*

This Court has previously announced a standard under which plaintiff's EMTALA

---

"testifying experts may not offer legal conclusions"); *United States v. Milton*, 555 F.2d 1198, 1203 (5th Cir. 1977) ("courts must remain vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury regarding the applicable law").

stabilization claim is negated by Mr. Morgan's admission to NMMC as an inpatient, unless plaintiff shows that Mr. Morgan was not admitted in good faith or that his admission was a mere subterfuge to evade liability.  No party herein has challenged or disputed the propriety or correctness of that standard.  NMMC admitted Mr. Morgan as a patient for nine days.  "In general ..., a hospital admits a patient to provide inpatient care."  *Bryant v. Adventist Health Systems/West*, 289 F.3d 1162, 1169 (9th Cir. 2002).  That was exactly what happened here. During Mr. Morgan's hospitalization, NMMC administered pain medication; took numerous CT scans and x-rays; performed procedures to relocate his shoulder; administered physical therapy; furnished consultations from a pain specialist, a neurosurgeon and an orthopedist; provided respiratory and occupational therapy; administered oxygen; provided an epidural steroid injection to relieve back pain; and recommended that Mr. Morgan submit to an MRI for further investigation of his back.  This regimen of diagnosis, treatment, therapy, and pain management ran up a hospital bill exceeding $24,000, the vast majority of which was incurred after NMMC's business office had been apprised that Mr. Morgan was uninsured and unable to pay for his medical care.

Against this compelling backdrop of good-faith treatment, plaintiff has not presented evidence from which a reasonable finder of fact could conclude that Mr. Morgan's hospital admission was a mere charade.  To be sure, Morgan faults NMMC's admitting physician for not diagnosing and treating her husband's vertebral compression fractures at the outset of his stay. NMMC and its physicians may or may not be at fault in that regard, but those dissatisfactions are actionable, if at all, only under state law, not EMTALA.  Morgan complains that Mr. Morgan's back problems were not stabilized at the time of discharge, and criticizes NMMC for not administering an MRI to explore the problem further.  But the record unequivocally shows that Mr. Morgan refused to submit to an MRI, despite NMMC's recommendation to the contrary. EMTALA does not require a hospital to diagnose a patient's medical conditions properly or to treat them competently, and it certainly does not oblige a hospital to force a patient to submit to a procedure.  In short, then, plaintiff believes that NMMC wronged Mr. Morgan by not properly diagnosing his back problems from the outset, by not doing enough to treat those conditions, by discharging him before the compression fracture had been stabilized, and by discharging him to his home instead of a rehabilitation center.  But the EMTALA stabilization requirement does not

-21-

provide a remedy for these purported slights, so long as NMMC admitted Mr. Morgan in good faith in order to treat the emergency medical conditions that it had diagnosed.  The summary judgment record confirms that NMMC did just that.  As such, whatever flaws or errors there may have been in Mr. Morgan's medical treatment at NMMC, no reasonable finder of fact could conclude that he was not admitted in good faith in order to stabilize the medical conditions diagnosed by the admitting physician.

For all of these reasons, plaintiff's EMTALA claim predicated on failure to stabilize is due to be, and the same hereby is, **dismissed**.

### B.      Outrage Claim.

Plaintiff's sole remaining cause of action is a state-law claim for outrage.  The Complaint alleges that the same conduct of NMMC that purportedly violated EMTALA "was intentional and/or reckless and was so extreme as to go beyond all possible bounds of decency and should be regarded as intolerable in our society."  (Complaint, ¶ 22.)  As a threshold matter, the parties cannot agree as to whether this claim is governed by Mississippi law or Alabama law.  The result is the same either way.

If this cause of action is properly analyzed under Mississippi law, it is time-barred.  *See McCorkle v. McCorkle*, 811 So.2d 258, 263 (Miss.App. 2001) (explaining that claim for outrageous conduct is more commonly known as intentional infliction of emotional distress under Mississippi law, and is subject to one-year limitations period); *Randolph v. Lambert*, 926 So.2d 941, 945-46 (Miss.App. 2006) (concluding that claim for intentional infliction of emotional distress is subject to one-year limitations period).[22]  Because this action was filed on

---

[22]        The equivalency of Alabama outrage claims to Mississippi intentional infliction of emotional distress claims is confirmed by *Funderburk v. Johnson*, 935 So.2d 1084 (Miss. App. 2006), wherein the court explained that "[t]o prove a claim of intentional infliction of emotional distress, a plaintiff must show that the defendant's conduct was extreme and outrageous, going beyond all possible bounds of decency."  *Id.* at 1100.  That is closely analogous, or even identical, to the Alabama outrage standard.  *Compare American Road Service Co. v. Inmon*, 394 So.2d 361, 365 (Ala. 1980) (Alabama outrage cause of action requires conduct "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society"); *Ex parte Lumbermen's Underwriting Alliance*, 662 So.2d 1133, 1134 n.1 (Ala. 1995) (indicating that Alabama's tort of outrage encompasses intentional infliction of severe emotional distress).

August 26, 2005, complaining of alleged wrongful acts occurring in late August 2003, any Mississippi-law claim for intentional infliction of emotional distress is plainly outside the one-year limit.  Plaintiff identifies no basis under which a Mississippi iteration of her purported outrage claim might comport with the requisite statute of limitations.

Instead, Morgan's position is that Alabama law governs the outrage cause of action, such that the statute of limitations poses no impediment.  It is true that Alabama outrage claims are subject to a two-year limitations period, and that this action was filed within two years after the alleged tortious conduct.  *See Archie v. Enterprise Hosp. and Nursing Home*, 508 So.2d 693, 695 (Ala. 1987) ("we hold that the tort of outrage or intentional infliction of emotional distress is governed by the two-year statute of limitations found in § 6-2-38(*l*)").  Nonetheless, Alabama courts have deemed outrage a "very limited cause of action that is available only in the most egregious circumstances."  *Thomas v. BSE Indus. Contractors, Inc.*, 624 So.2d 1041, 1044 (Ala. 1993) (noting that the Alabama Supreme Court "has held in a large majority of the outrage cases reviewed that no jury question was presented"); *see also House v. Corporate Services, Inc.*, 882 F.Supp. 161, 165 (M.D. Ala. 1995) ("the Alabama Supreme Court is not predisposed to recognize that tort of outrage claims present jury questions").  So circumscribed, in fact, is the reach of the tort of outrage that the Alabama Supreme Court has allowed such claims only in three limited circumstances: "cases having to do with wrongful conduct in the context of family burials; cases where insurance agents employed heavy-handed, barbaric means to coerce a settlement; and cases involving egregious sexual harassment."  *Carter v. Harris*, 64 F. Supp.2d 1182, 1194 (M.D. Ala. 1999) (citing *Thomas*).  The touchstone of such a claim is that the defendant's conduct was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."  *Soti v. Lowe's Home Centers, Inc.*, 906 So.2d 916, 919 (Ala. 2005) (citations omitted).

Viewed in the light most favorable to Morgan, the record shows that NMMC hospitalized and treated Mr. Morgan for nine days for injuries sustained in a 12-foot fall, that Mr. Morgan was treated for his vertebral compression fractures with an epidural injection, that NMMC urged Mr. Morgan to participate in physical therapy to alleviate his back pain, that Mr. Morgan was unable to do so, that plaintiff's expert faulted NMMC for not performing an MRI as to Mr.

Morgan's back problem, that NMMC recommended an MRI to investigate his back pain further, that Mr. Morgan declined the MRI, that NMMC discharged Mr. Morgan because of concerns that he might develop bedsores or contract disease in the hospital (such that a home environment was a better place for him), that NMMC arranged for an ambulance to transport Mr. Morgan from Tupelo, Mississippi to his home in Foley, Alabama, that Mr. Morgan was pleased with the services provided by the emergency medical technicians, that the NMMC ambulance crew left Mr. Morgan in his own bed with his family members, that NMMC physicians had arranged with Mr. Morgan's Alabama doctors for him to be seen promptly after his return home, that Morgan had no special medical training, and that Mr. Morgan died approximately 12 hours after returning home.  Considering all of these facts collectively, the Court is of the opinion that they do not support a reasonable inference that NMMC's conduct in this matter was so extreme and outrageous as to extend beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.[23]  Even if they did, there is absolutely no evidence from which a reasonable factfinder could conclude that NMMC acted intentionally or recklessly to cause emotional distress.  *See Ex parte Crawford & Co.*, 693 So.2d 458, 460 (Ala. 1997) (plaintiff claiming outrage must show that defendant's conduct was intentional or reckless, that it was extreme and outrageous, and that it caused severe emotional distress that no reasonable person could be expected to endure).

The events culminating in the death of Mr. Morgan were tragic.  They do not, however, satisfy the formidable threshold established by Alabama courts for the tort of outrage, as a matter

---

[23]     Alabama courts have been quite reticent to validate outrage claims in the health care context, or to expand the tort beyond its extraordinarily narrow parameters, even in the most egregious of circumstances.  *See, e.g., Callens v. Jefferson County Nursing Home*, 769 So.2d 273 (Ala. 2000) (affirming summary judgment on outrage claim where nursing home restrained patient to insert a catheter and, in doing so, bent patient's leg until it popped audibly, resulting in fractures to hip and pubic bones and requiring surgery, then intentionally lied to patient's family about cause of injury); *Grantham v. Vanderzyl*, 802 So.2d 1077 (Ala. 2001) (summary judgment proper on outrage claim, where doctor threw patient's blood and "surgical refuse" in the face of operating room nurse with whom he was having a disagreement, causing nurse to live with prolonged uncertainty as to whether doctor's acts had exposed her to HIV, hepatitis or other communicable diseases); *Gallups v. Cotter*, 534 So.2d 585, 589 (Ala. 1988) (outrage claim held not actionable where physicians removed life-support equipment from brain-dead patient despite family's lack of consent).

of law.  Defendant is entitled to summary judgment on plaintiff's outrage cause of action.

**V.      Conclusion.**

For all of the foregoing reasons, the Court finds that there are no genuine issues of material fact and that defendant is entitled to entry of judgment in its favor as a matter of law. As such, the Motion for Summary Judgment (doc. 40) is **granted**, and plaintiff's claims are **dismissed with prejudice**.  A separate judgment will enter.

DONE and ORDERED this 12th day of October, 2006.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE